IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| MARCIA ZUZUL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:14cv251 |
| | ) | |
| ROBERT MCDONALD, Secretary of | ) | |
| Veterans Affairs, and the | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

In the remaining claims of this employment discrimination action, Plaintiff Marcia Zuzul alleges that the Department of Veterans Affairs (the "VA") discriminated against her because of her race and gender, permitted the creation of a gender- and racially-hostile work environment, and retaliated against her, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. (Doc. 5.) Ms. Zuzul also brings claims of assault, battery, and defamation under North Carolina law against the United States, substituted for Dr. William F. Pearson. (Id. ¶¶ 139-60.) Before the court is the United States' motion to dismiss and, alternatively, for summary judgment. (Doc. 9.) Also before the court is Ms. Zuzul's motion for relief pursuant to Federal Rule of Civil Procedure 56(d). (Doc. 19.) For the reasons set forth below, the United States' motion to dismiss will be

granted in part and denied in part; its alternative motion for summary judgment will be denied; and Ms. Zuzul's Rule 56(d) motion will be denied as moot.

## I.  BACKGROUND

The allegations of the amended verified complaint, taken in the light most favorable to Ms. Zuzul, show the following.[1]

Ms. Zuzul — a white female — is a certified Nurse Anesthetist at the W. G. (Bill) Hefner Veterans Affairs Medical Center ("VAMC") in Salisbury, North Carolina. (Doc. 5 ¶ 15.) She has worked in anesthesia for nineteen years and in critical care for fifteen years. (Id.) She has worked at the VAMC since 2006 and served as a staff anesthesiologist since 2011. (Id. ¶¶ 15, 17.) During her time with the VA, she has always received "Outstanding" performance review ratings. (Id. ¶ 16.)

At some point, Ms. Zuzul began to work with Dr. William Pearson — a doctor practicing anesthesiology at VAMC who is allegedly black — about once or twice a week. (Id. ¶¶ 19, 98.) Dr. Pearson allegedly treated Ms. Zuzul coldly and in a demeaning manner, creating "tension" between the two. (Id. ¶ 19)

On April 5, 2012, Ms. Zuzul worked with Dr. Pearson on a team to provide a patient with anesthesia. (Id. ¶ 20.) During medical preparations and while at the patient's bedside, Dr. Pearson told

---

[1] Ms. Zuzul verified her complaint on July 10, 2014. (Doc. 17.)

Ms. Zuzul "we need to use Etomidate on this guy. He has a heart history and we could kill him if we do not."[2] (Id. ¶ 24.) According to the amended complaint, "[t]he use of Etomidate in the case at issue was contrary to the plan of care that was in place." (Id. ¶ 25.) Noticing that the patient "seemed concerned" by Dr. Pearson's statement, Ms. Zuzul recommended discussing the matter later. (Id. ¶ 27.) A disagreement then occurred between Ms. Zuzul and Dr. Pearson about the appropriate medications to administer. (Id. ¶¶ 27–28.) During the disagreement, Dr. Pearson "became irate and said that they would use whatever drug he recommended for the case." (Id. ¶ 29.) He then walked to the head of the patient's bed, where Ms. Zuzul stood attempting to administer medicine, "and pushed her out of the way so he could stand where she had been standing." (Id. ¶¶ 30–31.) In response, Ms. Zuzul stated that they should discuss the matter outside the patient's room, but Dr. Pearson raised his voice saying, "You are not putting my patient to sleep. I will do the case." (Id. ¶¶ 31–32.) While both Ms. Zuzul and Dr. Pearson were alongside the patient as he was moved to the operating room, Dr. Pearson told another doctor — Chief of Anesthesia Dr. Robert Blok — that Ms. Zuzul was "not listening" to him. (Id. ¶ 35.)

---

[2] "Etomidate is a short acting intravenous anesthetic agent used for the induction of general anesthesia and for sedation for short procedures." (Doc. 5 ¶ 25.)

The following day, April 6, 2012, Ms. Zuzul met with Dr. Blok, Chief of Staff Dr. Paul Lucha, and Union Representative Reggie Thurmond with the American Federation of Government Employees ("AFGE"). (Id. ¶ 39.) During the meeting, Ms. Zuzul was told that a fact-finding investigation would be conducted as a result of her complaint about the altercation with Dr. Pearson. (Id.) About a week later, on April 12, 2012, Ms. Zuzul met with Dr. Lucha, Dr. Blok, Mr. Thurmond, and Union Representatives Sharon Machovina and Pat Long. (Id. ¶ 40.) At the meeting, Dr. Lucha told Ms. Zuzul that Dr. Pearson disputed that either a physical or verbal assault occurred on April 5 and that the two should "learn to work together." (Id.)

The same day as that meeting, Ms. Zuzul filed a grievance (the "First Grievance") with the VA, "claiming that management simply told everyone to work together and get along rather than doing anything about the assault and the comments Pearson made in front of the patient." (Id. ¶ 41.) The grievance procedure at the VA requires an employee to proceed through a four-step process. (See Doc. 10-7.) On May 31, 2012, the AFGE filed a Step 2 Grievance on Ms. Zuzul's behalf, asserting that "[o]n or about April 12, 2012, management created a [sic] unhealthy and unsafe environment for Ms. Zuzul" after she "reported to management an altercation . . . between herself and another employee." (Doc. 10-6.) On July 2, 2012, and in response to the Step 2 Grievance, Dr. Lucha

granted the First Grievance.[3]  (Doc. 5 ¶¶ 41, 49; <u>see also</u> Doc. 10-8.)  She makes no allegation that she completed the last step of the four-step procedure.

Around April 18, 2012, Drs. Blok and Jean-Mary Breton met with Ms. Zuzul regarding the medical charts for two patients Ms. Zuzul had treated.  (Doc. 5 ¶¶ 42-43.)  The meeting was held because someone had assessed one of Ms. Zuzul's charts as "below the standards of anesthesia."  (<u>Id.</u> ¶ 43.)  Dr. Breton would not disclose who had made the assessment, but Dr. Blok "stated there was nothing wrong with the care [Ms. Zuzul] had provided" and that he had not authorized the review of her charts.  (<u>Id.</u> ¶¶ 44-45.)  On April 27, 2012, Ms. Zuzul initiated an Equal Employment Opportunity ("EEO") Complaint (the "First EEO Complaint") on the basis of gender and racial harassment based on the unauthorized assessment of her charts.  (<u>Id.</u> ¶ 47; <u>see also</u> Doc. 10-10 (noting filing date as August 15, 2012).)  At a September 2012 mediation of the complaint, Dr. Lucha acknowledged that Dr. Pearson was the one who had reviewed and assessed charts of patients treated by Ms. Zuzul, which she alleges were unauthorized assessments, and that Dr. Pearson "had problems working well with other nurse anesthetists at the VA."  (Doc. 5 ¶¶ 45, 50-51.)  Dr. Lucha further

---

[3] Ms. Zuzul also alleges that an AFGE Representative filed a "Step 3 Grievance" on her behalf.  (Doc. 5 ¶ 62.)  The filing, however, was meant "to address the fact that the [VA] did not follow the proper chain of command" as to an entirely different matter, and the complaint describes the filing as Ms. Zuzul's "Second Grievance."  (<u>Id.</u>)

agreed at the mediation that Dr. Pearson and Ms. Zuzul should not be assigned to work together and that they should be kept apart as much as possible.[4] (Id. ¶ 53.)

At some unspecified time, Dr. Pearson also filed an EEO complaint against Ms. Zuzul, claiming that Ms. Zuzul discriminated against him because he was "a heterosexual black male" and that she refused to work with him. (Id. ¶ 56.) According to Ms. Zuzul, these claims are false. (Id.) Dr. Pearson also filed EEO complaints against Dr. Blok, a nurse named Jeanette Burleson, and Dr. Breton. (Id. ¶ 57.)

On January 9, 2013, Ms. Zuzul was assigned to work on call with Dr. Pearson due to the small department size and staff shortages.[5] (Id. ¶ 63.) That evening, VAMC paged both Ms. Zuzul and Dr. Pearson, requesting that they come in for an emergency procedure. (Id. ¶¶ 64-65.) Ms. Zuzul told VAMC's hospital administrator that she would arrive in approximately thirty to

_____

[4] Ms. Zuzul filed a second EEO complaint (the "Second EEO Complaint") on September 27, 2012, after Dr. Lucha informed Ms. Zuzul that Dr. Pearson would serve as the acting Chief of Anesthesia while Dr. Blok was deployed, although Dr. Breton — as the most senior person — usually filled this position. (Id. ¶¶ 54-55.) The Second EEO Complaint alleged harassment and retaliation on the basis of gender and race. (Id. ¶ 55.) Ms. Zuzul, however, makes no allegation that she exhausted her administrative remedies as to this complaint. (See id. ¶¶ 3-10 (alleging that Ms. Zuzul exhausted her administrative remedies as to two other EEO complaints).)

[5] Ms. Zuzul's amended complaint also includes an evaluation by VA doctors of her temperature monitoring of patients. (Doc. 5 ¶¶ 59-61.) She admits, however, that her EEO complaint is still pending as to that evaluation. (Id. ¶ 61.)

forty-five minutes because of rainy conditions.  (Id. ¶ 65.)  Ms.
Zuzul then called Dr. Pearson to confirm with him that she was on
her way.  (Id. ¶ 66.)  Twenty minutes after the phone call, Dr.
Pearson called Ms. Zuzul, telling her that the emergency procedure
was "done" and that she was not needed, which Ms. Zuzul repeated
back to him to confirm.  (Id.)  Ms. Zuzul then called the hospital
administrator to inform them of what Dr. Pearson had said.  (Id.
¶ 68.)

The next morning, Dr. Breton and Wendy Bostian — an anesthesia
tech — informed Ms. Zuzul that Dr. Pearson told others that she
had "refused to come in" the night before and refused to cooperate.
(Id. ¶ 71.)  Sometime after hearing this, Ms. Zuzul met separately
with both Drs. Blok and Lucha.  (Id. ¶¶ 72–73.)  Dr. Pearson also
attended the meeting with Dr. Lucha and continued to claim Ms.
Zuzul refused to come in on January 9.  (Id. ¶ 73.)  Dr. Lucha
agreed to conduct another fact-finding investigation and changed
investigators after Ms. Zuzul's disagreement with the initial
investigator assignment.  (Id. ¶¶ 74–77.)  The fact finding on the
January 9 incident, however, took at least five weeks to get
underway.  (Id. ¶ 78.)  Since the January 9, 2013 incident, Ms.
Zuzul and Dr. Pearson have not worked together.  (Id. ¶ 79.)

On June 20, 2013, an anesthesia meeting occurred with a number
of individuals in attendance, including Dr. Pearson, Ms. Zuzul,
Drs. Blok, Breton, Steven Leder (a union representative), and Ms.

Burleson.  (Id. ¶ 80.)  The meeting concerned Dr. Pearson's treatment of another white female nurse anesthetist.  Along with several others, Ms. Zuzul discussed her strained relationship with Dr. Pearson.  (Id. ¶ 82.)  After Ms. Zuzul's recounting of the January 9 incident, Dr. Pearson repeated his claims that Ms. Zuzul refused to come in to the hospital that night.  (Id. ¶ 83.)  When Ms. Zuzul disagreed with his version of incident, Dr. Pearson twice yelled, "But you didn't come in, did you?" (Id. ¶ 84.) He repeated this question at the end of the meeting and "came at" Ms. Zuzul while pointing his finger at her.  (Id. ¶¶ 85–86.)  Feeling threatened and "wonder[ing] if he was going to push her again," Ms. Zuzul left the meeting room.  (Id. ¶¶ 86–87.)  On July 1, 2013, Ms. Zuzul initiated her fourth EEO complaint ("Fourth EEO Complaint") based on gender, sexual orientation, and race, concerning the January 9, 2013 incident and the June 20, 2013 meeting.[6]  (Id. ¶ 94.)

According to the amended complaint, Dr. Pearson's "false allegations" regarding Ms. Zuzul's charting, monitoring of patient temperatures, and failure to appear at work "damage[d] her professional reputation.  No other physician ha[d] questioned her professionalism or her competence prior to [Dr. Pearson.]"  (Id.

---

[6] Ms. Zuzul alleges that the Second EEO Complaint incorrectly noted "age" as the basis of the claim rather than "race."  (Doc. 5 ¶ 94.)  Moreover, the complaint makes no mention of sexual orientation as the basis for a cause of action.

¶ 88.)  The amended complaint also alleges that Dr. Pearson allows one black nurse anesthetist to take longer lunches than three white nurse anesthetists, that he allows one male nurse to question him and works collaboratively with him but is demeaning toward female nurses, and that he "does not converse or interact with" the white female nurses.  (<u>Id.</u> ¶¶ 89–92.)

On March 23, 2014, Ms. Zuzul filed a complaint, which she amended on April 16, 2014, alleging both race and gender discrimination, harassment, and retaliation against the VA, as well as assault, battery, and defamation against Dr. Pearson.[7] (Docs. 1, 5.)  On May 29, 2014, the United States filed a notice of substitution as to Ms. Zuzul's claims against Dr. Pearson based on the United States Attorney's certification, pursuant to the Westfall Act, also known as the Federal Employees Liability Reform and Tort Compensation Act of 1988, codified at 28 U.S.C. § 2679(d)(1) and (2).  (Doc. 8.)  The United States' Notice sought to substitute the United States for Dr. Pearson.  Ms. Zuzul objected to the substitution.  (Doc. 13.) On September 10, 2014, after the parties had fully brief the issue, this court adopted the August 6, 2014 Recommendation of the Magistrate Judge, substituting the United States for Dr. Pearson.  (Doc. 30.)

---

[7] Pursuant to Federal Rule of Civil Procedure 41(a), the parties stipulated to the dismissal of Count Two of the amended complaint, brought under 42 U.S.C. § 1981, and Ms. Zuzul's demand for punitive damages in the Counts One and Three.  (Doc. 22.)

On May 29, 2014, the United States filed its motion to dismiss — pursuant to Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure — or, in the alternative, a motion for summary judgment. (Doc. 9.)  The motion attached a number of documents related to Ms. Zuzul's efforts to exhaust her administrative remedies.[8]  (See Docs. 10-1 to 10-23.)  Ms. Zuzul simultaneously responded to the motion (Doc. 21), attaching her affidavit, and moved for relief pursuant to Rule 56(d) of the Federal Rules of Civil Procedure (Doc. 19).  Both motions have been fully briefed (Docs. 23, 26, 28), and the case is thus ripe for consideration.

## II. ANALYSIS

### A. Subject Matter Jurisdiction

A plaintiff bears the burden of establishing this court's jurisdiction over the subject matter of a lawsuit.  See Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982).  A motion challenging subject matter jurisdiction should be granted "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law."  See Richmond, Fredericksburg & Potomac R.R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991).  "A defendant may contest subject matter jurisdiction in one of two ways: by attacking the veracity of the allegations contained in the complaint or by contending that, even

---

[8] Ms. Zuzul affirmatively alleges that she administratively exhausted her First and Fourth EEO Complaints.  (Doc. 5 ¶¶ 3-10.)

assuming that the allegations are true, the complaint fails to set forth facts upon which jurisdiction is proper." Durden v. United States, 736 F.3d 296, 300 (4th Cir. 2013). "Generally, when a defendant challenges subject matter jurisdiction via a Rule 12(b)(1) motion to dismiss, the district court may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." Velasco v. Gov't of Indonesia, 370 F.3d 392, 398 (4th Cir. 2004).

Here, the United States moves to dismiss for lack of subject matter jurisdiction on three grounds. First, it contends that the court lacks jurisdiction over Ms. Zuzul's claims arising out of her First EEO Complaint because she elected to proceed under the VA's negotiated grievance process. (Doc. 10 at 11.) Second, it argues that the court lacks jurisdiction over her claims of assault, battery, and defamation. (Id. at 13–14.) Third, it contends that Ms. Zuzul failed to exhaust her claim of retaliation related to the audit of the charts of her patients.[9] (Doc. 24 at 6.) None of the United States' jurisdictional contentions

---

[9] The United States only raised this exhaustion challenge in its reply brief. (See Doc. 24 at 6.) This was in violation of Local Rule 7.3(h), which states that "[a] reply brief is limited to discussion of matters newly raised in the response." However, as administrative exhaustion is jurisdictional, this court must address the United States' challenge. See Hentosh v. Old Dominion Univ., 767 F.3d 413, 416 (4th Cir. 2014) (holding that failing to exhaust administrative remedies concerning a Title VII claim deprives a district court of jurisdiction).

challenges the veracity of Ms. Zuzul's allegations. Thus, when addressing the United States' jurisdictional arguments, the court assumes the truthfulness of Ms. Zuzul's allegations and draws all reasonable inferences in her favor. See AGI Assocs., LLC v. City of Hickory, N.C., 773 F.3d 576, 578 (4th Cir. 2014) ("When a defendant argues that the complaint fails to allege facts establishing subject matter jurisdiction . . . the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." (quotation marks omitted) (quoting Kerns v. United States, 585 F.3d 187, 192 (4th Cir. 2009))); Kerns v. United States, 585 F.3d 187, 193 (4th Cir. 2009) ("[W]hen a defendant asserts that the complaint fails to allege sufficient facts to support subject matter jurisdiction, the trial court must apply a standard patterned on Rule 12(b)(6) and assume the truthfulness of the facts alleged.").

**1. Claims Arising out of Ms. Zuzul's First EEO Complaint**

The United States maintains that this court lacks subject matter jurisdiction over claims arising out of Ms. Zuzul's First EEO Complaint because Ms. Zuzul elected to participate in the VA's negotiated grievance process concerning the events that underlie it. (Doc. 10 at 11.) Ms. Zuzul responds that the subject of her First Grievance on April 12, 2012, differs from the subject of her later-filed First EEO Complaint, and, therefore, this court has

12

jurisdiction over the claims raised in the latter. (Doc. 21 at 7-9.) The court concludes that the matters in the First Grievance and First EEO Complaint are indeed different, allowing Ms. Zuzul to bring claims related to the First EEO Complaint, but that Ms. Zuzul failed to exhaust her administrative remedies as to the First Grievance, barring claims arising out of it.

The Civil Service Reform Act ("CSRA") of 1978, Pub. L. No. 95-454, 92 Stat. 1111 (codified as amended in scattered sections of 5 U.S.C.), requires unions and federal employers to include procedures for settling grievances in their collective bargaining agreements. With limited exceptions, the CSRA mandates that those grievance procedures "shall be the exclusive administrative procedures for resolving grievances which fall within its coverage." 5 U.S.C. § 7121(a)(1). The CSRA defines "grievance" to include any complaint "by any employee concerning any matter relating to the employment of the employee." 5 U.S.C. § 7103(a)(9)(A).

One exception to the CSRA, however, permits employees aggrieved by discrimination in the workplace to "raise the matter under a statutory procedure *or* the negotiated [grievance] procedure, but not both." 5 U.S.C. § 7121(d) (emphasis added). Thus, an employee who alleges a discriminatory personnel practice may "elect to pursue his claim under either a statutory procedure or a union-assisted grievance procedure; [but] he cannot pursue

13

both avenues, and his election is irrevocable." Vinieratos v. U.S. Dep't of the Air Force, 939 F.2d 762, 768 (9th Cir. 1991); see also 29 C.F.R. § 1614.301(a) ("A person wishing to file a complaint or a grievance on a matter of alleged employment discrimination must elect to raise a matter under either [a discrimination statute] or the negotiated grievance procedure, but not both."). Ms. Zuzul elected to proceed under the union-negotiated grievance procedure as to her First Grievance but under the statutory EEOC process for her First EEO Complaint. The court must therefore determine whether Ms. Zuzul raised a "matter" in her First Grievance on April 12, 2012, that she then also raised in her First EEO Complaint. Determining the effect of Ms. Zuzul's First Grievance on her First EEO Complaint is a "jurisdictional inquiry." See Wilson v. Hagel, No. 5:13-CV-365, 2014 WL 3738530, at *2-5 (E.D.N.C. July 29, 2014) (treating this inquiry as a jurisdictional one); Tucker v. Astrue, 738 F. Supp. 2d 835, 838-39 (N.D. Ill. 2010) (same); Facha v. Cisneros, 914 F. Supp. 1142, 1146-47 (E.D. Pa. 1996) (same), as amended on reconsideration (Mar. 6, 1996), aff'd, No. 96-1383, 106 F.3d 384 (3d Cir. Dec. 13, 1996).

The term "matter" in 5 U.S.C. § 7121(d) has been interpreted to mean "the underlying employment action." Bonner v. Merit Systems Protection Bd., 781 F.2d 202, 204-05 (Fed. Cir. 1986); Macy v. Dalton, 853 F. Supp. 350, 353 (E.D. Cal. 1994); Van Houten v. Gober, No. Civ. A.9 8-270, 1998 WL 966021, at *5 (E.D. Pa. Nov.

14

10, 1998).  To determine whether a grievance and EEO complaint cover the same "matter," many courts apply a test formulated in Facha v. Cisneros, 914 F. Supp. 1142 (E.D. Pa. 1996).  See, e.g., Rosell v. Wood, 357 F. Supp. 2d 123, 129 (D.D.C. 2004); Van Houten, 1998 WL 966021, at *5.  In Facha, the court stated, "If [the employee] raised a topic in both documents, or if the arbitrators assigned to handle the grievance would necessarily have needed to inquire into a topic in discharging their duties, then § 7121(d) bars her from raising that same topic in her subsequent EEO complaint."  Facha, 914 F. Supp. at 1149.

Here, according to Ms. Zuzul's amended complaint, she and Dr. Pearson had a physical altercation at the bedside of a patient on April 5, 2012.  (Doc. 5 ¶¶ 20–38, 139–43.)  A meeting was held between management and Ms. Zuzul on April 12, 2012, attempting to resolve the issues arising from the altercation.  (Id. ¶¶ 39–40.)  Ms. Zuzul filed her First Grievance the same day as the meeting on April 12, 2012.  (Id. ¶ 41.)  The amended complaint states, "The First Grievance addressed the April 5, 2012 incident with Pearson." (Id. ¶ 48.)  According to Ms. Zuzul's Step 2 Grievance letter sent by AFGE's president, the factual matter of the First Grievance related to "management" creating an "unhealthy and unsafe environment for Ms. Zuzul" around April 12, 2012, after Ms. Zuzul's reporting of the altercation.  (Doc. 10-6.)  The letter goes on to mention a violation of a "Master Agreement" for management's

failure to properly resolve "problems" in connection with the altercation. (Id.) The Step 2 Grievance letter makes no reference to any incident other than the April 12, 2012 meeting and the underlying altercation.

In contrast, Ms. Zuzul's First EEO Complaint makes no mention of the altercation or April 12, 2012 meeting. (Doc. 10-10.) Rather, the EEO complaint states that Ms. Zuzul was discriminated against "because she was the only Nurse Anesthestist [sic] to have there [sic] patients [sic] charts audited." (Id.) Moreover, the complaint describes the "date of occurrence" of the discriminatory conduct as April 18, 2012. (Id.)

The "matter" of Ms. Zuzul's First Grievance, therefore, concerned the April 12, 2012 meeting and the underlying altercation between Ms. Zuzul and Dr. Pearson on April 5, 2012, from which the claims of assault and battery arose. The First EEO Complaint, alternatively, dealt with the April 18 audit of Ms. Zuzul's charts, which she alleges Dr. Pearson performed. As a result, the First Grievance and First EEO Complaint covered different matters, and, therefore, § 7121(d) is no jurisdictional bar to matters within the First EEO Complaint. See Facha, 914 F. Supp. at 1149–50 (holding that three matters covered in EEO complaints but not raised in employee's filed grievances were not jurisdictionally barred); Van Houten, 1998 WL 966021, at *5 (concluding that employee's reassignment claim "was not addressed during the

16

grievance procedure" and that "an arbitrator presented with [the employee's] grievance would not be obligated to reach the issue of his reassignment in resolving the merits of his [grievance's] claim").

While arguing that this court lacks subject matter jurisdiction over the matter in Ms. Zuzul's First EEO Complaint, the United States makes no argument regarding whether Ms. Zuzul exhausted her administrative remedies as to the matters within her First Grievance. (See Doc. 10 at 11.) A federal employee's failure to exhaust administrative remedies, however, is a bar to this court's subject matter jurisdiction. See Wilson v. Hagel, No. 5:13-CV-365-F, 2014 WL 3738530, at *3-5 (E.D.N.C. July 29, 2014) (holding that failure to exhaust administrative remedies under 5 U.S.C. § 7121(d) is a jurisdictional inquiry); see also Hentosh v. Old Dominion Univ., 767 F.3d 413, 416 (4th Cir. 2014) ("[A] failure by the plaintiff to exhaust administrative remedies concerning a Title VII claim deprives the federal courts of subject matter jurisdiction over the claim." (quoting Jones v. Calvert Grp., Ltd., 551 F.3d 297, 300 (4th Cir. 2009))). But see Adamov v. U.S. Bank Nat. Ass'n, 726 F.3d 851, 855-56 (6th Cir. 2013).

Under 5 U.S.C. § 7121(d), once an employee elects to proceed under a negotiated grievance procedure by timely filing a grievance in writing, she must exhaust her administrative remedies within that procedure. See Wilson, 2014 WL 3738530, at *3-5; Frasure v.

17

<u>Principi</u>, 367 F. Supp. 2d 245, 253 (D. Conn. 2005) ("Whichever route the employee chooses [under § 7121(d)], she must then exhaust that administrative remedy before pursuing her claim in court."). Importantly, facts showing the existence of subject matter jurisdiction "must be affirmatively alleged in the complaint." <u>Pinkley, Inc. v. City of Frederick</u>, 191 F.3d 394, 399 (4th Cir. 1999).

Here, Ms. Zuzul elected to file her First Grievance as to the April 12, 2012 meeting and the underlying April 5, 2012 altercation involving the alleged assault and battery. (Doc. 5 ¶ 40.) Once she chose this route, she was required to follow the negotiated grievance procedure as to her First Grievance, which entails a four-step process. (<u>See</u> Doc. 10-7 at 2-3.) She fails to allege, however, that she exhausted her administrative remedies (i.e., the four-step process).

Ms. Zuzul alleges that she filed a grievance, satisfying "Step 1" of the grievance procedure. (Doc. 5 ¶ 40.) But the United States attaches both her "Step 2 Grievance, Marsha [sic] Zuzul" letter from May 31, 2012, and Dr. Lucha's "Response to Grievance (Step 2) regarding Ms. Marsha [sic] Zuzul" from July 2, 2012. (Docs. 10-6, 10-8.) In Dr. Lucha's response, he concluded, "After careful consideration of the information available and provided, we appear to be working towards the same end. As such, your grievance is granted." (Doc. 10-8 at 2; <u>see also</u> Doc. 5 ¶ 49.)

In granting the request, Dr. Lucha stated that "management would do its best to minimize the amount of scheduled contact between [Dr. Pearson and Ms. Zuzul]." (Doc. 10-8 at 1.)

Ms. Zuzul's amended complaint makes no allegation that she proceeded any further with or exhausted the remaining grievance procedure she elected to pursue.[10] If Ms. Zuzul was not satisfied with Dr. Lucha's resolution of the matter, which must be the case because she seeks to proceed in this court, Step 3 of the four-step grievance process required her or the Union to "submit the grievance to the Director," along with grievance's basis and desired corrective action desired. (Doc. 10-7 at 3.) Then, "if . . . not satisfactorily resolved in Step 3," the grievance proceeds to Step 4, which allows the VA or the Union to refer the grievance to arbitration. (Id.); see also 5 U.S.C. § 7121(d) (stating that negotiated grievance procedures must "include procedures that . . . provide that any grievance not satisfactorily settled under the negotiated grievance procedure shall be subject to binding arbitration which may be invoked by either the exclusive representative or the agency"). Therefore, because Ms. Zuzul fails

---

[10] The amended complaint states that Ms. Machovina filed a Step 3 Grievance, which was allegedly granted. (Doc. 5 ¶ 62.) The amended complaint, however, describes the grievance as a "Second Grievance," concerning a different matter not properly before the court (i.e., a Focused Professional Practice Evaluation). (Id.) Even if this Second Grievance was in fact part of the process of the First Grievance, Ms. Zuzul still failed to allege affirmatively her exhaustion of "Step 4" of the negotiated grievance procedure.

to allege that she exhausted her administrative remedies under the negotiated grievance process, this court lacks subject matter jurisdiction over the alleged April 5, 2012 assault and battery and the April 12, 2012 meeting concerning the assault and battery.

### 2.  Claims of Assault, Battery, and Defamation

The United States also argues that this court lacks subject matter jurisdiction over Ms. Zuzul's fourth and fifth claims for assault, battery, and defamation against the United States, which is now substituted for Dr. Pearson. (Doc. 10 at 13.) The United States specifically contends that the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346 et seq., does not grant the court jurisdiction over those claims. (Id.) Ms. Zuzul responds that this court possesses jurisdiction because Dr. Pearson acted outside the scope of his employment when committing the alleged assault, battery, and defamation, and, therefore, "the exclusivity of the FTCA does not apply." (Doc. 21.)

In its September 10, 2014 Order, this court adopted the Magistrate Judge's August 6, 2014 Recommendation and substituted the United States for Dr. Pearson pursuant to 28 U.S.C. § 2679(d)(1). (Doc. 30.) In doing so, the court overruled Ms. Zuzul's objection that Dr. Pearson's actions were within the scope of employment. (Doc. 24.) With the United States substituted for Dr. Pearson, Ms. Zuzul's unresolved claims of assault, battery,

and defamation are now subject to the FTCA.[11]  See 28 U.S.C. § 2679(d)(4) ("Upon certification, any action or proceeding subject to paragraph [(d)](1) . . . shall proceed in the same manner as any action against the United States filed pursuant to section 1346(b) of this title and shall be subject to the limitations and exceptions applicable to those actions."); Osborn v. Haley, 549 U.S. 225, 230 (2007) ("Upon the Attorney General's certification, the employee is dismissed from the action, and the United States is substituted as defendant in place of the employee."); Sobitan v. Glud, 589 F.3d 379, 383 (7th Cir. 2009) ("[After the United States Attorney's certification,] [t]he suit then proceeds as though it had been filed against the United States under the FTCA.").

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."  FDIC v. Meyer, 510 U.S. 471, 475 (1994).  "Sovereign immunity is jurisdictional in nature." Id.; see also United States v. Sherwood, 312 U.S. 584, 586 (1941) ("[T]erms of [the United States'] consent to be sued in any court define that court's jurisdiction to entertain the suit."); J.C. Driskill, Inc. v. Abdnor, 901 F.2d 383, 385 n.4 (4th Cir. 1990) ("Waiver of sovereign immunity is a jurisdictional prerequisite in

---

[11] The court entered its Order substituting the United States for Dr. Pearson after the briefing on the current motions was complete.  Neither party has requested supplemental briefing to address any effect the Order could have on the pending motions.

the nature of, but not the same as, subject matter jurisdiction, in that unless sovereign immunity be waived, there may be no consideration of the subject matter."); Rich v. United States, 158 F. Supp. 2d 619, 630 (D. Md. 2001) ("When a plaintiff has failed to establish a waiver of sovereign immunity, a federal court lacks jurisdiction to hear the case." (citing Global Mail Ltd. v. U.S. Postal Serv., 142 F.3d 208, 210 (4th Cir. 1998))); 14 Charles Alan Wright et al., Federal Practice and Procedure § 3654 (3d ed. 2004) ("The natural consequence of the sovereign immunity principle is that the absence of consent by the United States is a fundamental defect that deprives the district court of subject matter jurisdiction.").

The FTCA provides a limited waiver of the United States' sovereign immunity "for certain torts committed by federal employees." Ignacio v. United States, 674 F.3d 252, 253 (4th Cir. 2012) (quoting FDIC, 510 U.S. at 475). The FTCA provides, in relevant part, that district courts shall have exclusive jurisdiction over civil actions on claims against the United States

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1); see also Kerns, 585 F.3d at 194 ("The FTCA

grants jurisdiction to the district courts only with respect to a 'certain category of claims.'" (quoting FDIC, 510 U.S. at 477)). The FTCA, however, provides that the United States' limited waiver of sovereign immunity as to negligence committed by government employees shall not apply to "[a]ny claim arising out of assault, battery, . . . libel, slander" or certain other listed torts. 28 U.S.C. § 2680(h).

Here, Zuzul alleges that the United States, through the actions of Dr. Pearson, committed three intentional torts against her under the FTCA — assault, battery, and defamation. (Doc. 5 ¶¶ 139-60.) As noted, the FTCA explicitly preserves the sovereign immunity of the United States for suits involving claims of assault, battery, libel, and slander. 28 U.S.C. § 2680(h). Therefore, because the United States retained its sovereign immunity under the FTCA as to those claims, Zuzul's claims of assault, battery, and defamation are jurisdictionally barred.[12] Shirvinski v. U.S. Coast Guard, 673 F.3d 308, 316 (4th Cir. 2012) (observing that the FTCA bars defamation actions against the United States); Weinraub v. United States, 927 F. Supp. 2d 258, 261-66 (E.D.N.C. 2012) (dismissing claims of assault and battery against the United States as barred by sovereign immunity); Khatami v.

---

[12] The court therefore need not address the United States' argument that Ms. Zuzul failed to exhaust her administrative remedies under the FTCA. (Doc. 10 at 13-14.) The court notes alternatively, however, that Ms. Zuzul's failure to exhaust her administrative remedies as to her First Grievance would bar her assault and battery claims. See supra.

Compton, 844 F. Supp. 2d 654, 664 (D. Md. 2012) (dismissing claim of defamation against the United States as barred by sovereign immunity).  Therefore, the United States' motion to dismiss Counts Four and Five will be granted.

### 3.    Retaliation Claim Related to the Chart Audit

The United States argues that Ms. Zuzul has failed to exhaust her retaliation claim as to the chart audit allegedly authorized by Dr. Pearson because she did not claim retaliation in her First EEO Complaint, which mentioned the audit.  (Doc. 24 at 6.) Although the United States raised this issue in its reply brief, the court must resolve it because administrative exhaustion is a jurisdictional inquiry.  See Hentosh, 767 F.3d at 416.

"The scope of the plaintiff's right to file a federal lawsuit is determined by the charge's contents."  Jones v. Calvert Grp., Ltd., 551 F.3d 297, 300 (4th Cir. 2009).  "An administrative charge of discrimination does not strictly limit a Title VII suit which may follow; rather, the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination." Bryant v. Bell Atl. Md., Inc., 288 F.3d 124, 132 (4th Cir. 2002) (quoting Chisholm v. U.S. Postal Serv., 665 F.2d 482, 491 (4th Cir. 1981)).  Stated differently, the litigation may encompass claims "reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint

may be maintained in a subsequent Title VII lawsuit." _Evans v._ _Techs. Applications & Serv. Co._, 80 F.3d 954, 963 (4th Cir. 1996). As the Fourth Circuit observed, "[T]he exhaustion requirement should not become a tripwire for hapless plaintiffs. While it is important to stop clever parties from circumventing statutory commands, we may not erect insurmountable barriers to litigation out of overly technical concerns." _Sydnor v. Fairfax Cnty, Va._, 681 F.3d 591, 594 (4th Cir. 2012).

The United States notes that, in her First EEO Complaint concerning the chart audit, Ms. Zuzul cites only gender and race discrimination as the basis for her complaint. (Doc. 23 at 6.) The United States' observation is correct in that Ms. Zuzul does not expressly cite "retaliation" as an additional basis for her complaint. (_See_ Doc. 10-10.) However, the United States' argument is hyper-technical and of the type the Fourth Circuit warned would create an "insurmountable barrier[] to litigation out of overly technical concerns." _Sydnor_, 681 F.3d at 594. While not explicitly listing "retaliation" as the basis of her complaint, Ms. Zuzul's First EEO Complaint clearly states a claim of retaliation in the section of the form, in fact, titled "Claim(s)." (Doc. 10-10) The charge states, "Claim: . . . Alleges she was discriminated against by the Chief of Surgery . . . [a]fter participating in a fact-finding, because she was the only nurse anesthestist [sic] to have there [sic] patients['] charts

25

audited." (Id.) Although not expressly using the word "retaliation," Ms. Zuzul's First EEO Complaint sufficiently claimed retaliation, in the form of the audit, after the fact-finding connected to her First Grievance. Therefore, Ms. Zuzul exhausted her administrative remedies for her retaliation claim related to the chart audit, and the motion to dismiss on this ground will be denied.

## B. Motion to Dismiss for Failure to State a Claim

The United States also moves to dismiss the amended complaint for failure to state a claim upon which relief can be granted under Rule 12(b)(6). It argues that the complaint fails to allege sufficient facts to make plausible a claim of racial or gender discrimination, retaliation, or harassment.[13] (Doc. 10.) Ms. Zuzul maintains that she has alleged sufficient facts to state all claims. (Doc. 21.)

Federal Rule of Civil Procedure 8(a)(2) provides that a complaint must contain a short and plain statement of the claim showing that the plaintiff is entitled to relief. Under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678

---

[13] Ms. Zuzul's "Count Three" lists claims of gender discrimination and retaliation but makes no mention of gender harassment. (See Doc. 5 at 21.) At the beginning of the amended complaint, however, the claims listed related to gender include a harassment claim. (Id. ¶ 1.)

(2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). A Rule 12(b)(6) motion "challenges the legal sufficiency of a complaint considered with the assumption that the facts alleged are true." Francis v. Giacomelli, 588 F.3d 186, 192 (4th Cir. 2009) (internal citations omitted). However, pleadings that "are no more than conclusions are not entitled to the assumption of truth." Iqbal, 556 U.S. at 679. And mere "'labels and conclusions' or 'formulaic recitation of elements of a causation of action will not do.'" Id. at 678 (quoting Twombly, 550 U.S. at 555).

While the parties have submitted evidence outside the pleadings in connection with the United States' motion to dismiss based on subject matter jurisdiction (see Docs. 10-1 to 10-21, 21-1), none of it should be considered when evaluating Ms. Zuzul's claims under Rule 12(b)(6) unless the court elects to treat the motion as one for summary judgment. See Fed. R. Civ. P. 12(d); Richmond, 945 F.2d at 768. An exception to this rule exists where the matters outside the pleadings were integral to and explicitly relied upon in the complaint. See Am. Chiropractic Ass'n v. Trigon Healthcare, Inc., 367 F.3d 212, 234 (4th Cir. 2004) (considering document outside of the pleadings that plaintiff "explicitly

referred to" in its complaint); <u>Phillips v. LCI Int'l, Inc.</u>, 190 F.3d 609, 618 (4th Cir. 1999). While some of the documents outside of the complaint meet this exception (e.g., Doc. 10-17 (one of Ms. Zuzul's EEO complaints)), the court need not consider them at this stage because they are pertinent only to the United States' 12(b)(1) motion.

### 1. Race and Gender Discrimination Claims

The United States first argues that Ms. Zuzul's amended complaint fails to state a claim of race or gender discrimination because it alleges no adverse employment action.[14] (Doc. 10 at 15.) Ms. Zuzul contends that "there are genuine issues of material fact that preclude summary judgment" on her claims and that discovery "may reveal further genuine issues of material fact" regarding the allegations' effect on Ms. Zuzul's "retention and promotion potential." (Doc. 21 at 16.)

To allege racial or gender discrimination, a plaintiff must allege that her employer discriminated against her "with respect to h[er] compensation, terms, conditions, or privileges of employment" because of her race or gender. 42 U.S.C. § 2000e-2(a)(1); <u>see also</u> <u>McCleary-Evans v. Md. Dep't of Transp., State</u>

---

[14] The United States also contends that Ms. Zuzul's amended complaint fails to allege that her "race or gender was indeed a motivating factor behind the [VA's] actions" (Doc. 10 at 15), but she clearly alleges the actions were "based on," "on the basis of," "because of," and "as a result of" her race and gender. (<u>See</u> Doc. 5 ¶¶ 89–92, 99, 100, 104, 135.)

Highway Admin., No. 13-2488, ___ F.3d ___, 2015 WL 1088931, at *3 (4th Cir. Mar. 13, 2015). Even viewed in the light most favorable to Ms. Zuzul, her factual allegations fail to state a claim of racial or gender discrimination.

To allege discrimination, a plaintiff must allege that she suffered an "adverse employment action." Coleman v. Maryland Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, sub nom. Coleman v. Court of Appeals of Md., 132 S. Ct. 1327 (2012); cf. Gerner v. Cnty. of Chesterfield, Va., 674 F.3d 264, 266 (4th Cir. 2012) (finding allegations sufficient to establish "adverse employment action" at motion to dismiss stage). An adverse employment action is one in which an employee suffers a "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion." Boone v. Goldin, 178 F.3d 253, 255 (4th Cir. 1999); see also Page v. Bolger, 645 F.2d 227, 233 (4th Cir. 1981) (explaining that, under Title VII, an adverse employment action occurs in "ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating").

Here, Ms. Zuzul's amended complaint points to several actions attempting to plead discriminatory treatment: the April 18, 2012 audit; Dr. Pearson's allegedly false statement on January 10, 2013, about Ms. Zuzul's failure to come to work; and Dr. Pearson's yelling at the June 20, 2013 meeting. None of those allegations,

however, constitutes an adverse employment action for purposes of racial or gender discrimination. See Boone, 178 F.3d at 255; Murphy v. Danzig, 64 F. Supp. 2d 519, 523 (E.D.N.C. 1999). Ms. Zuzul makes no allegation that any of those actions caused negative consequences such as demotion, denial of promotion opportunities, or reduction in salary. In fact, as to the April 18, 2012 audit, Ms. Zuzul alleges that Dr. Pearson's superior, Dr. Blok, told her that "there was nothing wrong with the care Zuzul provided," making no suggestion that she suffered an adverse result from the audit. (Doc. 5 ¶ 45.) Although Ms. Zuzul alleges that together these actions "damage[d] her professional reputation" (Doc. 5 ¶ 88), that allegation is insufficient to allege an adverse employment action for purposes of racial or gender discrimination. See Rock v. McHugh, 819 F. Supp. 2d 456, 470 (D. Md. 2011) (concluding that failing to issue a performance appraisal and issuing a personal improvement plan, a verbal reprimand, and a formal letter of reprimand all failed to constitute sufficient allegations of adverse employment actions); Patterson v. Johnson, 505 F.3d 1296, 1298 (D.C. Cir. 2007) (finding "loss of reputation" not a materially adverse consequence of employment action); Cornelius v. City of Columbia, 663 F. Supp. 2d 471, 477 (D.S.C. 2009) (concluding that "an evaluation, brief period of probation, alleged unwarranted criticism and unfavorable job assignment" did not constitute adverse employment actions), aff'd sub nom.

Cornelius v. Columbia, City of, S. Carolina, 399 F. App'x 853 (4th Cir. 2010); McNeil v. Loyola Univ., No. CIV. WDQ-13-1473, 2014 WL 320494, at *6-7 (D. Md. Jan. 27, 2014) (holding that allegations of employee's placement on probation not an adverse employment action); Naughton v. Sears, Roebuck & Co., No. 02-4761, 2003 WL 360085, at *5 n.1 (N.D. Ill. 2003) (criticism, including a negative performance review or development plan, does not constitute an adverse employment action); Lewis v. Forest Pharm., Inc., 217 F. Supp. 2d 638, 648 (D. Md. 2002) ("Reprimands, whether oral or written, do not *per se* significantly affect the terms or conditions of employment."). Therefore, Ms. Zuzul's amended complaint fails to state claims of race and gender discrimination, and the United States' motion to dismiss those claims as alleged in Counts One and Three will be granted.

### 2. Race and Gender Retaliation Claims

The United States contends that Ms. Zuzul's complaint fails to sufficiently allege a claim of retaliation. (Doc. 10 at 18-19.) It specifically argues that Ms. Zuzul pleaded no facts alleging a materially adverse employment action. (Id.) Ms. Zuzul counters that the facts provided in her amended complaint sufficiently plead claims of retaliation. (Doc. 21 at 13-15.) The court agrees with Ms. Zuzul.

A sufficient claim of retaliation requires allegations that an employer discriminated against its employees "because" that

employee "opposed any [unlawful employment] practice" or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e-3(a); see also Coleman, 626 F.3d at 190. Unlike claims of disparate impact, however, the standard for what constitutes discrimination for a retaliation claim is "less strenuous than the standard in a discrimination claim." Madock v. McHugh, No. ELH-10-2706, 2011 WL 3654460, at *26 (D. Md. Aug. 18, 2011) (internal quotation marks omitted). Instead, a plaintiff must only allege discrimination that "a reasonable employee would have found . . . materially adverse, which in this context means it might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)) (internal quotation marks omitted); see also Twisdale v. Paulson, 595 F. Supp. 2d 686, 698 (S.D.W. Va. 2009) (holding that the Burlington standard "applies with equal force in the federal-employment context").

As with her claims of race and gender discrimination, Ms. Zuzul points to several employment actions as negatively affecting her professional reputation. (Doc. 5 ¶ 88.) For one, the April 18, 2012 audit allegedly caused by Dr. Pearson occurred six days after she filed her First Grievance with the VA. (Id. ¶ 41.) Opposition activity under Title VII encompasses utilizing

grievance procedures.  See <u>Armstrong v. Index Journal Co.</u>, 647 F.2d 441, 448 (4th Cir. 1981).  The amended complaint alleges that, after filing two EEO complaints — in April and September of 2012 — on January 10, 2013, Dr. Pearson falsely told others that Ms. Zuzul "refused to come in." (<u>Id.</u> ¶¶ 63–71.)  Dr. Pearson made the same claim to his superior, Dr. Blok.  (<u>Id.</u> ¶ 73.)  Finally, the next time Dr. Pearson and Ms. Zuzul were together, at a meeting in June 2013, Dr. Pearson yelled at Ms. Zuzul, repeatedly stating that she refused to come into work when on call.[15] (<u>Id.</u> ¶¶ 80–87.) She alleges that the combination of Dr. Pearson's accusations following protected activity "damaged her professional reputation." (<u>Id.</u> ¶ 88.)

Allegations that retaliatory actions caused the loss of professional reputation can constitute adverse employment actions

---

[15] Ms. Zuzul also points to her allegation that Dr. Pearson threatened to sue her, take her house, affect her nursing license, cause her to lose her job, and report her to both the North Carolina Nursing Board and the Secretary of the Department of Veteran's Affairs.  (Doc. 21 at 15 (referencing Doc. 5 ¶¶ 152–53).)  For one, these allegations arise in her defamation count and are not incorporated into her counts for race or gender retaliation.  See Fed. R. Civ. P. 10(c) (permitting adoption by reference); Hinton v. Trans Union, LLC, 654 F. Supp. 2d 440, 446 (E.D. Va. 2009) ("[I]t is well-settled, as a leading treatise notes, that incorporation by reference under Rule 10(c) 'must be direct and explicit, in order to enable the responding party to ascertain the nature and extent of the incorporation.'" (quoting 5A Charles Alan Wright et al., Federal Practice & Procedure § 1326 (3d ed. 2004))), aff'd, 382 F. App'x 256 (4th Cir. 2010).  Moreover, Ms. Zuzul provides no dates for these allegations, and the court has no way of knowing whether that alleged conduct occurred after any protected activity.  Thus, this allegation also fails to state a plausible claim.  See Iqbal, 556 U.S. at 679 (stating that an allegation is insufficient under Rule 8 of the Federal Rules of Civil Procedure "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct").

for purposes of employment retaliation claims.  See <u>Wanamaker v.</u>
<u>Columbian Rope Co.</u>, 108 F.3d 462, 466 (2d Cir. 1997) (holding, at
the summary judgment stage, that actions "besmirch[ing]"
employee's reputation could serve as an adverse employment action
in the context of an ADEA retaliation claim); <u>Salami v. N.C. Agric.</u>
<u>& Technical State Univ.</u>, 394 F. Supp. 2d 696, 719 (M.D.N.C. 2005)
("[I]n the retaliation context, the retaliation need not reach the
level of hiring, refusing to promote, or discharging, where the
alleged retaliatory acts alter the terms, conditions, or benefits
of employment.  Adverse employment actions also include actions
'that would adversely affect one's professional reputation or
ability to gain future employment, whether or not there was an
ultimate employment decision.'" (quoting <u>Howze v. Va. Polytechnic</u>,
901 F. Supp. 1091, 1098 (W.D. Va. 1995))), <u>aff'd</u>, 191 F. App'x 193
(4th Cir. 2006).  Ms. Zuzul's amended complaint therefore states
claims for retaliation, and the United States' motion to dismiss
those claims in Counts One and Three will be denied.

### 3.  Racial and Gender Harassment Claim

Finally, the United States argues that Ms. Zuzul's
allegations of a hostile work environment fail to state a claim as
they fail to plead sufficiently severe or pervasive harassment.[16]

---

[16] The United States also argues that the allegations insufficiently
allege that the harassment was based on gender or race. (Doc. 10 at 16–
18.)  Again, however, Ms. Zuzul clearly claims the alleged actions were
"based on," "because of," "on the basis of," and "as a result of" her
race and gender. (<u>See</u> Doc. 5 ¶¶ 89–92, 99, 100, 104, 135.)

(Doc. 10 at 16-18.)  Ms. Zuzul contends that the alleged harassment was sufficiently severe and pervasive.  (Doc. 21 at 17-20.)

To survive a motion to dismiss, a racial or gender harassment claim must plead facts making plausible that an employee experienced unwelcome harassment because of race or gender; that the harassment was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere"; and that there exists some basis for imposing liability on her employer.  See Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (defining "actionable" harassment under Title VII); see also 42 U.S.C. § 2000e-2(a)(1); Bass v. E.I. DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir. 2003).  Even with all reasonable inferences drawn in Ms. Zuzul's favor, her amended complaint fails to state a claim because it fails to allege a sufficiently "severe or pervasive" hostile work environment.

To state an actionable claim, the conduct must meet both an objective and a subjective standard: it must be "severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive."  Conner v. Schrader-Bridgeport Int'l, Inc., 227 F.3d 179, 192 (4th Cir. 2000) (internal brackets omitted).  In making this determination, the court must examine the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it

is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Spriggs v. Diamond Auto Glass, 242 F.3d 179, 184 (4th Cir. 2001) (quoting Harris, 510 U.S. at 23). "[P]laintiffs must clear a high bar in order to satisfy the severe or pervasive test." EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 315 (4th Cir. 2008).

Ms. Zuzul's amended complaint falls demonstrably short. The facts alleged here amount to no more than "a story of a workplace dispute" between Dr. Pearson and Ms. Zuzul. Bass, 324 F.3d at 765. The April 18, 2012 audit as well as the January 9 and June 20, 2013 incidents appear to have arisen from a personal dispute between Dr. Pearson and Ms. Zuzul. The amended complaint also shows VA management's repeated efforts to resolve the differences between the two following notice of Ms. Zuzul's complaints. (See, e.g., Doc. 5 ¶¶ 39 (conducting fact-finding investigation on April 6, 2012), 40 (meeting about results of fact finding), 73 (Ms. Zuzul's meeting with Dr. Pearson's supervisor), 81 (holding meeting about Dr. Pearson's behavior with Ms. Zuzul and other nurses).) Ms. Zuzul's allegations demonstrate a conflict of personalities creating workplace tension but not a gender- or "racially-charged, offensive environment that courts have found actionable." Signal v. Gonzales, 430 F. Supp. 2d 528, 539 (D.S.C. 2006); see also Bass, 324 F.3d at 765 ("[Plaintiff's] complaint is

full of problems she experienced with her co-workers and supervisors. These facts, however, do not seem to have anything to do with gender, race, or age harassment."); Hawkins v. PepsiCo, Inc., 203 F.3d 274, 276 (4th Cir. 2000) (holding that complaint premised on "a routine difference of opinion and personality conflict with her supervisor" insufficiently stated actionable facts for a hostile work environment claim); Buchhagen v. ICF Int'l, Inc., 545 F. App'x 217, 219 (4th Cir. 2013) (holding that "mockingly" yelling at plaintiff, making "snide comments" to plaintiff, "playing favorites with employees," "repeatedly harping" on plaintiff's mistake, and "unfairly scrutinizing and criticizing" plaintiff failed to state hostile work environment claim)[17]; Hoffman v. Baltimore Police Dep't, 379 F. Supp. 2d 778, 791 (D. Md. 2005) (finding plaintiff's allegations that he was forced to relocate his office numerous times, that his work was subjected to "intense scrutiny," that he was given an increased case load and forced to work longer uncompensated hours, and that his job title was downgraded fell short of stating a hostile work environment claim); Averette v. Diasorin, Inc., No. 3:11CV203, 2011 WL 3667218, at *3 (W.D.N.C. 2011) (stating "[a]ll of Plaintiff's allegations of 'harassment' do nothing more than establish that she did not get along with her co-workers"). The

---

[17] Unpublished opinions are not binding precedent in this circuit.

facts alleged fall short of the race- or gender-based actions necessary to state a hostile work environment claim. <u>Cf. Ocheltree v. Scollon Prods., Inc.</u>, 335 F.3d 325, 333 (4th Cir. 2003) (finding that male coworkers' almost daily conduct, which included repeatedly simulating sex with a mannequin, directing vulgar and sexually explicit songs at plaintiff, and presenting her with graphic pornography, were sufficiently severe or pervasive to create an abusive work environment); <u>Spriggs</u>, 242 F.3d at 185 (use of "odious" racial epithets create conditions for abusive working environment). Thus, the United States' motion to dismiss Ms. Zuzul's racial and gender harassment claims contained in Counts One and Three of the amended complaint will be granted.

### C. Alternative Motion for Summary Judgment and Ms. Zuzul's Rule 56(d) Motion

The United States also moved alternatively for summary judgment. (Doc. 9.) Ms. Zuzul responded with a motion for relief pursuant to Rule 56(d) of the Federal Rules of Civil Procedure. (Doc. 19.)

The court will deny the United States' motion for summary judgment as to Ms. Zuzul's retaliation claims, which survived the United States' motion to dismiss. As noted earlier, the United States' exhibits submitted in addition to the amended complaint pertained only to the United States' Rule 12(b)(1) motion and had no bearing on the substantive merits of Ms. Zuzul's claims. (<u>See</u>

Docs. 10-1 to 10-22 (offering documentation of Ms. Zuzul's administrative efforts).) Consequently, Ms. Zuzul's motion for Rule 56(d) relief is moot.

## III. CONCLUSION

For the reasons stated,

IT IS THEREFORE ORDERED that the United States' motion to dismiss (Doc. 9) is GRANTED IN PART and DENIED IN PART, and that Ms. Zuzul's claims for discrimination and harassment based on race and gender contained in Counts One and Three of the amended complaint are DISMISSED, her claims for assault and battery contained in Count Four are DISMISSED, and her claim for Defamation contained in Count Five is DISMISSED. The motion to dismiss her remaining claims for retaliation contained in Counts One and Three is DENIED.

IT IS FURTHER ORDERED that the United States' alternative motion for summary judgment (Doc. 9) is DENIED.

IT IS FURTHER ORDERED that Plaintiff's motion for relief pursuant to Federal Rule of Civil Procedure 56(d) (Doc. 19) is DENIED as MOOT.

/s/ Thomas D. Schroeder
United States District Judge

March 31, 2015